UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KATHLEEN NORTON,

                    Plaintiff,                              Case No. 13-cv-13730

v                                                          Honorable Thomas L. Ludington

LTCH d/b/a McLaren Bay Special Care and
Bay Regional Medical Center d/b/a McLaren Bay
Region,

                    Defendants.

_____/

## ORDER DENYING MOTION FOR RECONSIDERATION AND STRIKING DEFENDANTS' RESPONSE

Plaintiff Kathleen Norton brought suit against her former employer alleging interference and retaliation in violation of the Family Medical Leave Act ("FMLA"). Norton had been employed with Defendants for over seventeen years when she began suffering from severe medical conditions that forced her to miss work. After Norton's employment was terminated, she sued Defendants for violations of her rights under the FMLA.

On June 20, 2014, Defendants moved for summary judgment on Norton's claims, asserting that she had not established a prima facie case of FMLA interference or retaliation. On September 9, the Court granted summary judgment in Defendants' favor on both claims. Op. & Order at 1, ECF No. 26.

On September 16, 2014, Norton timely filed a motion for reconsideration of the September 9, 2014 Opinion & Order. In her motion, she requests that this Court reconsider its grant of summary judgment on her FMLA retaliation claim.

Although Norton identifies a palpable defect in the Court's September 9, 2014 Opinion & Order, she cannot show that the correction of this palpable defect will result in a different disposition of her case. Accordingly, her motion for reconsideration will be denied.

**I**

Norton was formerly employed as a Registered Nurse for Defendant McLaren Bay Regional for over seventeen years. Pl.'s Resp., Ex. 1, ECF No. 16. As an at-will employee, Norton was obligated to comply with her employer's attendance and FMLA policies, as well as the disciplinary guidelines. Despite receiving complimentary performance evaluations, Norton violated the Attendance Policy, which provides:

> An employee who accumulates (3) absence periods in a rolling six-month period is subject to corrective action (see Corrective Action policy) and, ultimately, termination of employment if he or she fails to realign the unacceptable behavior successfully (see Termination/Loss of Employment policy). Such corrective actions are active for a twelve-month period from the date of issuance.

Defs.' Summ. J. Ex. B at 1-2. More simply, once an employee accumulates three absence points in a six-month period, that employee may be subject to disciplinary action, such as a written reprimand. Once an employee receives a reprimand, that reprimand remains in effect for a twelve-month period.

Norton received several reprimands pursuant to the Attendance Policy. On January 28, 2013, Norton received a First Written Reprimand. Defs.' Summ. J. Ex. K. Norton received a Second Written Reprimand on February 13, 2013, *id*. Ex. L, and a Final Written Reprimand on February 22, 2013, *id*. Ex. M. Norton admitted that she understood that any further attendance infractions could result in termination. *Id*. Norton Dep. at 37.

**A**

In May 2013, Norton began experiencing "extreme dizziness accompanied by nausea . . . and episodic photophobia . . . ." Pl.'s Resp. Ex. 1 at 107. Because of these symptoms, Norton applied for intermittent leave pursuant to the FMLA, which was approved on July 17, 2013. *Id*. Ex. 12. As a result of the approval, Defendants retroactively approved Norton for FMLA leave for June 6, 2013; June 7, 2013; June 11, 2013; and June 12 through June 26, 2013. *Id*. Ex. 13. Thus, any tardies or absences on those days qualified as FMLA leave and did not count as violations of Defendants' Attendance Policy.

**B**

On July 14, 2014, Norton clocked-in two minutes late. Although her tardiness is not disputed the parties provide different accounts of what happened after her tardy clock-in. Even though the Court must take the facts in a light most favorable to the non-moving party, Norton, both accounts will be presented.

**i**

According to Norton, she began experiencing vertigo and nausea as she prepared for work on July 14, 2013. These symptoms continued as she drove to work, and she knew that the symptoms were affecting her ability to drive: "I was suffering from some symptoms and had to delay my arrival in order to get there safely . . . ." Defs.' Mot. Summ. J., Norton Dep. 58. Norton further contends that the "sudden onset of symptoms" made it impossible for her to contact her department and advise them of her tardiness. Resp. at 5.

After clocking-in two minutes late, Norton proceeded to complete her shift. She admits that she never told her supervisors or management the reason for her tardiness—not on July 14 and not at any other time. Pl.'s Resp., Ex. 1 at 50.

On July 18, 2013—four days after her late clock-in and one day after she had been approved for retroactive FMLA leave—Norton's supervisors requested that she attend a meeting with them and a representative from Human Resources.

Norton recalls that there were three representatives from management in the meeting: Monica Baranski, Cherri Burzynski, and Marilyn Bostick.  However, Norton admits that she cannot recall much of what happened during the meeting:

| | |
|---|---|
| Q: | Do you recall the details of this meeting as we sit here today? |
| Norton: | I guess it would depend on what details you want to know. |
| Q: | Do you recall how long the meeting lasted? |
| Norton: | No, not specifically. |
| …. | |
| Q: | And as we're sitting here now you're telling me you don't have any specific recollections of what Marilyn said during the meeting? |
| Norton: | I mean no, I don't have specific—I can't give you a play-by-play of what happened in that meeting. I can tell you that I, like I just said, I was shocked at what was happening, I was feeling very distressed and very sort of disoriented about the events that were taking place at the moment. |

Pl.'s Resp. Ex. 1 at 52.

At the meeting, management informed Norton that her employment had been terminated due to her repeated violation of the Attendance Policy.  Although Norton admits that she does not remember specifics, she maintains that no one at the meeting asked her the reason for July 14 tardy.  Pl.'s Resp. Ex. 1 at 51.  Moreover, Norton claims that no one at the meeting took notes: "I do not recall seeing them take notes." *Id.* at 62. At the conclusion of the meeting, Norton claims that she protested the termination, refused to sign the termination notice, and complained that

Defendants were inconsistently applying their Attendance Policy. *Id.* at 50. Defendants then terminated Norton's employment.

### ii

Defendants dispute Norton's memory of the July 18 meeting with HR. According to HR Consultant Marilyn Bostick, Norton explained that she was tardy on July 14 because she was waiting for the babysitter to arrive:

> Q:        What do you recall from the discussions at the July 18th meeting?
>
> Bostick:  That when we brought her in she – we talked about her being tardy on Sunday, July 14th. And she up front indicated that she needed to get a babysitter and she had to wait for that babysitter to arrive.
>
> Q:        Was there any further discussion?
>
> Bostick:  The further discussion was she kind of jumped into, as it indicates in the notes, that she didn't – she wasn't disputing that she was late; she needed to get the babysitter and that she didn't understand why she was sitting there at the meeting because others had poor performance and they were still here.

Defs.' Mot. Summ. J., Bostick Dep. at 9. When Ms. Bostick asked Plaintiff whether there was any other reason for her late arrival, Norton reiterated that she had to wait for the babysitter to arrive. *Id.* at 10. Ms. Bostick claims that she recorded Norton's answers contemporaneously in her notes. *Id.* Because Norton was tardy for an impermissible reason, Defendants terminated her employment for violation of the Attendance Policy.

### II

A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correct the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable defect" is

"obvious, clear, unmistakeable, manifest, or plain." *Id.* at 734 (citing *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 2d 262, 278 (E.D. Mich. 7.1 (h)(3)).

Norton moves for reconsideration on one claim: she contends that this Court improperly dismissed her FMLA retaliation claim. She contends that this Court erred when it concluded that she had not presented evidence that she engaged in a protected activity, which is part of her prima facie burden.

### III

Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). "[T]he plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* (citing *Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)).

If the plaintiff makes this prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *Macy*, 484 F.3d at 364). If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. *Id.* "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.*

- 6 -

**A**

To establish a prima-facie case of FMLA retaliation, Norton must show that (1) she engaged in a statutorily protected activity, (2) Defendants were aware that she engaged in protected conduct, (3) she suffered an adverse employment action, and (4) there was a causal connection between the adverse employment action and the protected activity. *Id.* (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

**i**

Norton asserts that she engaged in a statutorily protected activity when she applied for, and was granted, FMLA leave for her illness. This assertion is at the crux of her motion for reconsideration: she claims that the Court erred in construing her claim of protected activity too narrowly in its Order dismissing her retaliation claim.

In its September 9, 2014 Order, the Court concluded that Norton could not show she engaged in a statutorily protected activity because she could not show that Defendants had notice that she intended to use intermittent FMLA leave on July 14, 2013. Having determined that she could not satisfy the first and second elements of her prima facie case based on the July 14, 2013 tardy, this Court dismissed her retaliation claim.

As Norton's motion for reconsideration makes clear, however, Norton's retaliation claim was not limited to her July 14, 2014 tardy. Instead, she asserts that she engaged in statutorily protected activity by applying for FMLA leave in June 2013 and by receiving FMLA approval on July 17, 2014. Norton's assertion is supported by caselaw: the Sixth Circuit has repeatedly concluded that requesting and taking FMLA leave are protected activities under the FMLA. *See Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 372 (6th Cir. 2013); *Bryson*, 498 F.3d at 570-71. And Norton has also offered evidence that Defendants—including her supervisors—knew

that she had been approved for FMLA leave before they terminated her employment. *See* Pl.'s Resp. at Ex. 13.

Because this Court did not consider Norton's argument that her FMLA request and prior FMLA leave constituted protected activity, there is a palpable defect in the Court's September 9, 2014 Order that misled the Court and the parties. Therefore, if Norton can show that correcting this defect—i.e., accepting that Norton engaged in FMLA-protected activity, and that Defendants were aware of this activity—will result in a different disposition of her case, her motion for reconsideration will be granted. Accordingly, the question next becomes whether Norton has otherwise satisfied her prima-facie burden under the McDonnell-Douglas framework.

**ii**

Defendants do not dispute that Norton suffered an adverse employment action; Defendants terminated her employment on July 18, 2013. Norton has thus satisfied the third element of her prima facie case—that she suffered an adverse employment action.

Defendants claim, however, that Norton cannot show a causal connection between the protected activity (requesting and taking FMLA leave) and the adverse employment action (the termination of her employment).

To satisfy the fourth element and establish a causal connection between the protected activity and the adverse employment action, a plaintiff must present sufficient evidence to "raise [an] inference that her protected activity was the likely reason" for the adverse action. *Sosby v. Miller Brewing Co.*, 211 F. App'x 382, 387 (6th Cir. 2006) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). However, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that

enables the court to deduce that there [was] a causal connection between the retaliatory action and the protected activity." *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 190 (6th Cir. 2010).

Norton attempts to show causation by demonstrating the temporal proximity of events. She asserts that Defendants terminated her employment just twenty-four hours after her FMLA request was approved. Defendants approved Norton's request for intermittent FMLA leave on July 17, 2013. Pl.'s Resp. Ex. 9. The next day, McLaren Bay Region's Human Resource Generalist, Markie Misiak, sent an e-mail to management noting that Norton's requests for leave on June 6, 2013; June 7, 2013; June 11, 2013; and June 12-26, 2013, had been retroactively designated as approved FMLA leave.

Just one day after Norton's FMLA request was approved—and the same day that Ms. Misiak provided notice to management that Norton's earlier absences were designated as FMLA-qualifying—Defendants terminated Norton's employment. Pl.'s Resp. Ex. 9. Norton relies on this temporal proximity to establish her prima facie burden of causation.

Although temporal proximity alone is generally insufficient to establish circumstantial evidence of a causal connection, the Sixth Circuit has clarified that, in some circumstances, temporal proximity alone can suffice to show a causal connection in a retaliation case: "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) (analyzing temporal proximity under the ADEA and Elliot-Larsen Civil Rights Act).[1] Twenty-four hours is a close temporal connection

---

[1]      The Sixth Circuit relies on other employment discrimination law to fill the gaps in FMLA case law. *See, e.g., Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (relying on ADA, ADEA, and Title VII cases); *Bryson*, 498 F.3d at 561 (same).

that is sufficient to show a causal connection. *Id.*; *see also Dye v. Office of the Racing Com'n*, 702 F.3d 286, 306 (6th Cir. 2012) ("A lapse of two months . . . is sufficient to show a causal connection, and the district court erred in holding otherwise.").

Here, the twenty-four hour time period between the approval of Norton's FMLA request and the termination of her employment is sufficient to show a causal connection between the two.[2] And because Norton has sufficiently shown a causal connection, Norton has satisfied her prima facie case for FMLA retaliation.

## B

Because Norton has established a prima facie case of FMLA retaliation, the burden now shifts to Defendants to show that they had a legitimate reason for terminating her employment. Defendants are not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)

Defendants claim that they terminated Norton's employment because of her excessive absenteeism. Defendants note that Norton's "attendance points accumulated so quickly and so

---

[2]     It is noteworthy, however, that Defendants had warned Norton several times that her Attendance Policy infractions could lead to termination of her employment—some warnings were even given months or years before Norton applied for FMLA leave. *See* 2010 Performance Evaluation, Defs.' Summ. J. Ex. I (noting that Norton "needs to improve attendance"); 2011 Performance Evaluation, Defs.' Summ. J. Ex. J (Noting that Norton "needs to improve attendance"); February 22, 2013 Final Written Warning (noting that "[f]urther violation of any of the Infractions during the next twelve months from today's date may result in the termination of your employment."). When, as here, there is evidence that an employer had been concerned about a problem before the employee engaged in protective activity, this mitigates the significance of the temporal connection. *Smith v. Allen Health System, Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). Nonetheless, because the temporal proximity between the granting of Norton's FMLA leave request and the termination of her employment is so close, Norton can rely solely on temporal proximity in satisfying her prima facie burden to establish causation.

steadily . . . in just two months as to result in a Final Written Reprimand—after which she continued to violate the Attendance Policy . . . ."  Defs.' Summ. J. at 17 (citations omitted).

Excessive absenteeism is a legitimate reason to terminate an employee.  *See Summerville v. ESCO Co.*, 52 F. Supp. 2d 804, 813 (W.D. Mich. 1999) ("The Court agrees that regular attendance is a minimum function of almost any job and that excessive absenteeism is a legitimate reason to terminate an employee."); *Ritenour v. Tennessee Dep't of Human Servs.*, 497 F. App'x 521, 532 (6th Cir. 2012) (violation of the absenteeism policy is a legitimate reason to terminate an employee).

Norton concedes that she had violated the Attendance Policy on several occasions—she had received three written reprimands, including a Final Written Reprimand that warned that further violations could result in termination.  Nor does Norton argue that her time records are inaccurate or false, or that these Attendance Policy infractions were fraudulent.  Accordingly, Defendants have produced a legitimate reason for the termination of Norton's employment.

## C

Because Defendants have articulated a legitimate reason for their action, the burden of production shifts back to Norton to demonstrate that Defendants' reason is pretextual.  A plaintiff generally shows pretext by showing that the proffered reason: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds, Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)).  Norton relies on the

second method in attempting to show that Defendant's legitimate reason was actually pretextual.[3]

The second method is an attack on the credibility of the employer's proffered reason. *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006) (citing *Manzer*, 29 F.3d at 1084). The second method admits that the employer's proffered reason has a basis in fact but denies that it created sufficient cause for the adverse employment action. *Id*. It "ordinarily consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*.

Norton does not dispute that she had received Final Written Reprimand, nor does she dispute that she violated the Absenteeism Policy by clocking-in tardy after receiving the Final Written Reprimand. Thus, she is conceding that Defendants' proffered reason for terminating her employment had a basis in fact.

She contends, however, that this proffered reason was insufficient cause for the adverse employment action, and therefore she attempts to show that an allegedly similarly-situated employee who had not requested FMLA leave under the new Attendance Policy, Ms. Jennifer Pogue,[4] was treated differently.

---

[3]     In defending against Norton's claim that the reason for the termination of her employment was pretextual, Defendants rely on the "honest belief rule." The honest belief rule provides that when the employer can demonstrate an honest belief in its proffered reason, the inference of pretext is not warranted—even if the employer is ultimately mistaken. *See Smith v. Chrysler Corp.*, 155 F.3d at 806. However, the honest belief rule applies in situations where the plaintiff is attempting to show pretext via the first method—that the employer's legitimate reason had no basis in fact. Here, Norton admits that she was tardy after receiving a Final Written Reprimand, and therefore she is not attempting to show that Defendants' reason for her termination has no basis in fact. Accordingly, the "honest belief" defense is not applicable here.

[4]     In their motion for summary judgment, Defendants preemptively suggest that Norton may argue that Ms. Carla Glover was also similarly-situated, and they contend that she is not similarly situated because she had been previously denied FMLA leave. However, in her response brief, Norton does not make that argument, and does not attach any deposition or other piece of evidence that would suggest Norton is attempting to claim that Ms. Glover is similarly situated. "When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived . . . ." *Ctr. for*

**i**

The Sixth Circuit has held that employees must be treated similarly if they are "similarly situated in all respects."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("[T]he individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").  In the more recent case of *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998), the Sixth Circuit clarified that a plaintiff must "demonstrate that he or she is similarly situated to the non-protected employer in all *relevant* respects."  (emphasis original).

The parties proffer little information about Ms. Pogue, but a review of the exhibits indicates that she apparently had the same supervisor as Norton.  Moreover, Norton impliedly asserts that Ms. Pogue was subject to the same standards as Norton, even though Norton does not explain Ms. Pogue's job title or duties.  And because Defendants have not contested these implications, for summary judgment purposes, Ms. Pogue will be assumed to have the same supervisor and be subject to the same standards as Norton.

Although Defendants apparently concede those points, they do contend that Ms. Pogue is not similarly situated to Norton because there are differentiating circumstances that distinguish Defendants' treatment of them.  Most importantly, Defendants contend that Norton and Ms. Pogue are not similarly situated because Norton had received a Final Written Reprimand while Ms. Pogue had not.  Defendants further note that no other employee "ever got to the point of

---

*Biological Diversity v. Rural Utils. Serv.*, 2009 WL 3241607, at *3 (E.D. Ky. Oct. 2, 2009) (citing *Humphrey v. United States AG Office*, 279 F. App'x 382, 331 (6th Cir. 2008).  Accordingly, by not responding to Defendants' argument that Ms. Glover is not similarly-situated, Norton has waived any argument that Ms. Glover is a similarly-situated employee.

receiving a Final Written Reprimand for such attendance violations . . . and Plaintiff cannot identify any other employees who had received a Final Written Reprimand [but] were not discharged for a subsequent violation." Defs.' Summ. J. at 17 (citing *Woida v. Genesys Regional Medical Center*, 2014 WL 1017099 (E.D. Mich. Mar. 18, 2014)).

To determine whether Ms. Pogue and Norton were similarly situated, an in-depth review of Norton's and Ms. Pogue's disciplinary infractions is necessary. Therefore, this Court has included a chart summarizing their infractions[5] (both excused and unexcused):

### Chart 1: Actual Disciplinary Records

| Kathleen Norton | | | Ms. Pogue | | |
|---|---|---|---|---|---|
| **Date** | **Infraction** | **Points** | **Date** | **Infraction** | **Points** |
| 11/20/2012 | call-in | 1.00 | 12/28/2012 | tardy | 0.50 |
| 12/11/2012 | tardy | 0.50 | 1/3/2013 | tardy | 0.50 |
| 12/15/2012 | call-in | 1.00 | 1/14/2013 | tardy | 0.50 |
| 12/16/2012 | call-in[6] | | 1/22/2013 | tardy | 0.50 |
| 1/22/2013 | tardy | 0.50 | 1/23/2013 | call-in | 1.00 |
| 1/23/2013 | tardy | 0.50 | 1/26/2013 | tardy | 0.50 |
| 1/25/2013 | call-in | 1.00 | **1/28/2013** | **First Written Reprimand** | **3.50** |
| **1/28/2013** | **First Written Reprimand** | **4.50** | 4/29/2013 | tardy | 0.50 |
| 2/10/2013 | tardy | 0.50 | **5/7/2013** | **Second Written Reprimand** | **4.00** |
| **2/13/2013** | **Second Written Reprimand** | **5.00** | July | tardy | excused |
| 2/14/2013 | tardy | 0.50 | | | |
| **2/22/2013** | **Final Written Reprimand** | **5.50** | | | |

---

[5]     Norton's absences pursuant to FMLA leave have been omitted because no party contends that Defendants impermissibly used the FMLA absences in calculating points under the Attendance Policy. Defs.' Summ. J. Norton 38.

[6]     A review of the records indicates that the December 16, 2012 call-in infraction did not result in the accrual of a point.

| 7/14/2013[7] | tardy | 0.50 |
|---|---|---|
| **7/18/2013** | **Termination** | **6.00** |

A comparison of the charts shows—at least facially—that Norton and Ms. Pogue were not similarly situated. Norton had accumulated 6.00 infraction points when her employment was terminated, while Ms. Pogue had accumulated only 4.00 points. And, as Defendants point out, Norton had received a Final Written Reprimand, while Ms. Pogue had not. Thus, at least facially, Ms. Pogue is not similarly situated to Norton.

**ii**

Indeed, Norton does not proffer evidence to contradict Defendants' assertions that no other employee had received a Final Written Reprimand. Rather, Norton asserts that no other employer received a Final Written Reprimand because Defendants applied their Absenteeism Policy inconsistently—which is can be evidence of pretext.[8] In other words, had Defendants properly and consistently applied their Absenteeism Policy, Ms. Pogue would have been on Final Written Reprimand (rather than on her Second Written Warning) and therefore would be similarly situated to Norton.

In her attempt to show inconsistent enforcement of the Attendance Policy, Norton relies on one provision: "[a]n employee who accumulates (3) absence periods in a rolling six-month period is subject to corrective action . . . ." Defs.' Summ. J. Ex. B at 1-2. Norton contends that although Ms. Pogue had accumulated 3.0 points as of January 23, 2013, she was not given a First Written Reprimand—as required by the Attendance Policy. Instead, Ms. Pogue did not receive a

---

[7]     Norton had already received a First Written Reprimand and a Second Written Reprimand, and therefore these disciplinary warnings remained in effect for twelve months. Thus, Norton's July 14, 2013 could result in further disciplinary action, despite the fact that it was not incurred within the same six-month period as, for example, the November 20, 2012 call-in infraction.

[8] "Businesses need to consistently enforce disciplinary policies because selective enforcement would open the door to discrimination allegations." *Austin v. Fuel Systems, LLC*, 379 F. Supp. 2d 884, 904 (W.D. Mich. 2004).

First Written Reprimand until she had accumulated 3.50 points.  Thus, Norton contends, by failing to issue a First Written Reprimand when Ms. Pogue accumulated 3.0 points on January 23, 2013, Defendants effectively "excused" that tardy.

Moreover, she continues, by "excusing" and failing to issue a First Written Reprimand for Ms. Pogue's January 23, 2013 tardy, Defendants created an avalanche effect regarding subsequent tardies—i.e., if Ms. Pogue had properly received a First Written Reprimand at 3.0 points, she would then have received a Second Written warning at 3.5 points, and then a Final Written Warning at 4.0 points.

**Chart 2: Ms. Pogue's Hypothetical Disciplinary Record with Consistent Application**

| Date | Infraction | Points |
|------|-----------|--------|
| 12/28/2012 | tardy | 0.50 |
| 1/3/2013 | tardy | 0.50 |
| 1/14/2013 | tardy | 0.50 |
| 1/22/2013 | tardy | 0.50 |
| 1/23/2013 | call-in | 1.00 |
| | *First Written Reprimand* | *3.00* |
| 1/26/2013 | tardy | 0.50 |
| | *Second Written Reprimand* | *3.50* |
| 4/29/2013 | tardy | 0.50 |
| | *Final Written Reprimand* | *4.00* |
| July | tardy | Excused |

And had Ms. Pogue been issued a Final Written Reprimand at 4.0 points for the April 29, 2013 tardy, Norton contends she would then be able to show that Defendants had failed to fire another similarly situated employee who was tardy after receiving a Final Written Reprimand. *See* Chart 2.  That is—hypothetically—Defendants would have excused Ms. Pogue's July tardy

after she had received a Final Written Reprimand, but would have terminated Norton for the tardy occurring after her Final Written Reprimand.

Of course, if this argument has merit as to Ms. Pogue, then the argument is also applicable to Norton's disciplinary history. That is, had the Disciplinary Policy been properly enforced when she received 3.0 points—as Norton asserts it should have been for Ms. Pogue—Norton's disciplinary history would look like this:

**Chart 3: Norton's Hypothetical Disciplinary Record with Consistent Application**

| Date | Infraction | Points |
|---|---|---|
| 11/20/2012 | call-in | 1.00 |
| 12/11/2012 | tardy | 0.50 |
| 12/15/2012 | call-in | 1.00 |
| 12/16/2012 | call-in | |
| 1/22/2013 | tardy | 0.50 |
| | *First Written Reprimand* | *3.00* |
| 1/23/2013 | tardy | 0.50 |
| | *Second Written Reprimand* | *3.50* |
| 1/25/2013 | call-in | 1.00 |
| | *Final Written Reprimand* | *4.50* |
| 2/10/2013 | tardy | 0.50 |
| 2/14/2013 | tardy | 0.50 |
| 7/14/2013 | tardy | 0.50 |
| **7/18/2013** | **Termination** | **6.00** |

From a review of Norton's and Ms. Pogue's disciplinary records, it does indeed appear that Defendants inconsistently applied their Absenteeism/Disciplinary Policy—but, if anything, in Norton's favor. Indeed, following Norton's own logic, she should have received a First Written Warning when she accumulated at least 3.0 points—after the January 22, 2013 tardy. *See* Chart 3. Taking Norton's logic to its inevitable conclusion, if Defendants had properly

disciplined Norton according to the Disciplinary Policy, she would have received a Second Written Warning for the January 23, 2014 tardy and a Final Written Reprimand for the January 25, 2014 call-in.  *Id.*

However, Norton did not receive her First Written Warning until she had accumulated 4.5 points—after her January 25, 2013 call-in infraction.  Thus, according to Norton's logic, Defendants effectively excused two tardies (January 22 & 23, 2013) before it issued her a First Written Warning for the January 25, 2013 call-in infraction.  She cannot in good faith claim that Defendant's excuse of her two tardies is worse treatment than Defendants' alleged excuse of Ms. Pogue's single tardy.[9]

### iii

In addition to Ms. Pogue's January 26, 2013 tardy, Norton also points to Ms. Pogue's July 2013 tardy, which was excused by management.  Thus, Norton argues, not only did Defendants effectively excuse Ms. Pogue's tardy in January, they also excused a tardy that would have occurred after Ms. Pogue had earned a Final Written Reprimand (assuming Defendants had consistently applied their Disciplinary Policy).

First, as noted above, Defendants effectively excused two of Norton's tardies—which is, at the least, the same treatment than Ms. Pogue received.  Alternatively, assuming that

---

[9]      Moreover, it is noteworthy that the alleged excuse of Ms. Pogue's tardy—and the alleged disparate treatment arising from that excuse—occurred in January 2013.  To show FMLA retaliation, Norton has to proffer evidence that creates an inference that the termination of her employment in July was due to her FMLA-protected activity.  Norton's allegation that Defendants' excuse of Ms. Pogues tardy in January creates an inference of FMLA retaliation in July is not logical.  When Defendants "excused" Ms. Pogue's January tardy, they were unaware that five months later Norton would apply for FMLA leave.

Indeed, at that point (January 2013), Ms. Pogue was the individual who had previously engaged in FMLA-protected activity.  In 2011, Ms. Pogue applied for and received FMLA leave.  Resp. Ex. 18 at 20-21.  Moreover, Ms. Pogue applied for and received FMLA leave at some point in 2013—though the parties do not provide an exact date.  *Id.*

Thus, the disparate treatment occurred before Norton even engaged or attempted to engage in FMLA-protected activity.  Moreover, an employee who had previously engaged in FMLA-protected activity was granted an excuse.  Thus, the "excusal" of Ms. Pogue's tardy on January 26, 2013, does not give rise to an inference that Norton was treated differently due to her FMLA-protected activity.

Defendants had consistently applied their Disciplinary Policy to Norton, she would have received her Final Written Reprimand after her January 25, 2013 call-in infraction. *See* Chart 4. Thus, assuming Norton had properly been given a Final Written Reprimand at that point, her subsequent tardies on February 10 & 14, 2013 were both "excused". *Id.*

**Chart 4: Comparison of Norton and Ms. Pogue's Hypothetical Disciplinary Record**

| Kathleen Norton | | | | Ms. Pogue | | |
|---|---|---|---|---|---|---|
| **Date** | **Infraction** | **Points** | | **Date** | **Infraction** | **Points** |
| 11/20/2012 | call-in | 1.00 | | 12/28/2012 | tardy | 0.50 |
| 12/11/2012 | tardy | 0.50 | | 1/3/2013 | tardy | 0.50 |
| 12/15/2012 | call-in | 1.00 | | 1/14/2013 | tardy | 0.50 |
| 12/16/2012 | call-in | | | 1/22/2013 | tardy | 0.50 |
| 1/22/2013 | tardy | 0.50 | | 1/23/2013 | call-in | 1.00 |
| | *First Written Reprimand* | *3.00* | | | *First Written Reprimand* | *3.00* |
| 1/23/2013 | tardy | 0.50 | | 1/26/2013 | tardy | 0.50 |
| | *Second Written Reprimand* | *3.50* | | | *Second Written Reprimand* | *3.50* |
| 1/25/2013 | call-in | 1.00 | | 4/29/2013 | tardy | 0.50 |
| | *Final Written Reprimand* | *4.50* | | | *Final Written Reprimand* | *4.00* |
| 2/10/2013 | tardy | 0.50 | | July | tardy | excused |
| 2/14/2013 | tardy | 0.50 | | | | |
| 7/14/2013 | tardy | 0.50 | | | | |
| **7/18/2013** | **Termination** | **6.00** | | | | |

In other words, proper application of the Disciplinary Policy according to Norton would have resulted in:

1.     Ms. Pogue receiving a Final Written Reprimand after her April 29, 2013 tardy, with Defendants excusing her subsequent July tardy.[10]

---

[10]     It is also noteworthy that, had Defendants terminated Ms. Pogue's employment for the July tardy, Ms. Pogue would have received a final written reprimand after accumulating 4.5 points—the same number Norton had accumulated when she received her *first* written reprimand.

> 2. Norton receiving a Final Written Reprimand after her January 25, 2013 call-in infraction, with Defendants excusing her subsequent February 2 and 3, 2013 tardies.

*Id*.

Thus, applying Norton's argument, she was still treated more favorably than Ms. Pogue. Even assuming that Ms. Pogue should have received a Final Written Reprimand after the April 29, 2013 tardy—thereby making her similarly situated to Norton—Defendants only excused one of her subsequent tardies. In contrast, Defendants excused two of Norton's subsequent tardies. Again, it appears Defendants treated Norton *more favorably* than Ms. Pogue.

**iv**

In summary, Defendants did indeed apply their Disciplinary Policy inconsistently, which can be evidence of retaliation. However, contrary to Norton's claims, this inconsistent application resulted in more favorable treatment for her. Had the Defendants applied their Disciplinary Policy as Norton suggests they should have—that is, providing a first written warning when an employee receives 3.0 absence points—Norton would have received her First Written Reprimand for her January 22, 2013 tardy. Instead, Defendants did not issue Norton a First Written Reprimand until she had accrued 4.5 points. This is more favorable treatment than that of Ms. Pogue, the alleged comparator, who received a First Written Reprimand after accumulating only 3.5 points. Thus, Defendants' inconsistent application of their Disciplinary Policy does not create an inference that Norton's termination was a result of her engaging in FMLA-protected activity.

**v**

As noted above, Ms. Pogue is not similarly situated to Norton because she had not received a Final Written Reprimand while Norton had. But even assuming that Ms. Pogue is

similarly situated, Norton cannot show that Ms. Pogue was treated more favorably.  Indeed, the evidence indicates that Norton was treated more favorably—Norton did not receive a First Written Reprimand until she had accumulated 4.5 points, meaning Defendants effectively excused two tardies.

And because Norton does not proffer any other evidence that Defendants' reason for terminating her employment—excessive absenteeism—was pretextual, her FMLA retaliation claim cannot survive summary judgment.

## IV

On September 29, 2014, Defendants filed a response to Norton's Motion for Reconsideration without first seeking permission from the Court. *See* Resp., ECF No. 33. Eastern District of Michigan Local Rule 7.1(h)(2) prohibits parties from filing responses to motions for reconsideration or rehearing: "No response to the motion and no oral argument are permitted unless the court orders otherwise." Therefore, Defendants' response to Norton's Motion for Reconsideration will be stricken.

## V

Although Norton's motion for reconsideration identified a palpable defect in this Court's September 9, 2014 Order, she cannot show that correction of that defect would result in a different disposition of the case.  Norton has not offered evidence that Defendants' reason for terminating her employment was pretextual, and therefore her FMLA retaliation claim cannot survive summary judgment.

Accordingly, it is **ORDERED** that Norton's Motion for Reconsideration of the Court's September 9, 2014 Order (ECF No. 31) is **DENIED**.

It is further **ORDERED** that Defendants' response to Norton's Motion for Reconsideration (ECF No. 33) is **STRICKEN**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 1, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 1, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

---